<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE EASTERN DISTRICT OF PENNSYLVANIA</u>

```
ROBERT HODOR,                      )
                                   )  Civil Action
            Plaintiff             )  No. 11-cv-04657
                                   )
       v.                          )
                                   )
ST. LUKE'S HOSPITAL &              )
HEALTH NETWORK,                    )
                                   )
            Defendant             )
```

\*   \*   \*

APPEARANCES:

        JOHN S. HARRISON, ESQUIRE
           On behalf of Plaintiff

        DAVID M. STECKEL, ESQUIRE
           On behalf of Defendant

\*   \*   \*

<u>O P I N I O N</u>

JAMES KNOLL GARDNER
United States District Judge

      This matter is before the court on the Motion of

Defendant to Dismiss Counts III and VI of Amended Complaint,

which motion was filed November 18, 2011 ("Motion to Dismiss").[1]

Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss

Counts III and VI of the Amended Complaint was filed December 9,

2011 ("Plaintiff's Brief").

---

[1]    Defendant's motion was accompanied by a Memorandum of Law in
Support of Defendant's Motion to Dismiss Counts III and VI of the Amended
Complaint ("Defendant's Memorandum").  Additionally, defendant attached
Exhibits A, an undated Neuropsychological Examination report prepared by
Thomas Sugalski, Ph.D., following his examination of plaintiff on April 22,
2009, and related documents, and B, plaintiff's letter dated June 13, 2009 to
Andrew Seidel, defendant's Assistant Vice President of Human Resources, to its
motion to dismiss.

Count III of the Amended Complaint charges defendant with retaliation (by firing plaintiff) in violation of the Americans with Disabilities Act ("ADA").  Count VI charges defendant with retaliation in violation of the Pennsylvania Human Relations Act ("PHRA").

For the reasons expressed below, defendant's Motion to Dismiss the Amended Complaint is denied, and defendant shall have until October 29, 2012 to file an answer to plaintiff's Amended Complaint.

<u>JURISDICTION</u>

This court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331 because plaintiff's Amended Complaint alleges that defendant violated the federal Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, and thus poses a federal question.

<u>VENUE</u>

Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because defendant resides in this judicial district and because a substantial part of the events giving rise to this cause of action occurred in this judicial district.

<u>PROCEDURAL HISTORY</u>

On July 25, 2011 plaintiff initiated this action by filing a seven-count Complaint against defendant St. Luke's

Hospital & Health Network.[2]

On October 11, 2011 defendant filed a Motion of Defendant to Dismiss Counts III, V and VII of the Complaint, and to Dismiss or Strike Plaintiff's Claim for Punitive Damages in Counts VI and VII of the Complaint.  As indicated by the title of this motion, defendant's initial motion to dismiss sought dismissal of Counts III, V, and VII of the Complaint and to dismiss or strike plaintiff's claim for punitive damages under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.S.C.A. §§ 951-963.

On October 31, 2012 plaintiff filed an Amended Complaint.  The Amended Complaint removed Count V from the Complaint, which alleged retaliation in violation of the ADA[3]. The Amended Complaint also removed from the Complaint plaintiff's demand for punitive damages in connection with plaintiff's PHRA claims.  The filing of plaintiff's Amended Complaint rendered moot defendant's initial motion to dismiss.[4]

---

[2]     Plaintiff's Complaint asserts a claim for disability discrimination in violation of the Americans with Disabilities Act ("ADA") (Count 1); harassment in violation of the ADA (Count 2); retaliation in violation of the ADA (Count 3); perceived disability discrimination in violation of the ADA (Count 4); retaliation in violation of the ADA (Count 5); disability discrimination and harassment under the Pennsylvania Human Relations Act ("PHRA") (Count 6); and retaliation in violation of the PHRA (Count 7).

[3]     Plaintiff alleged the same ADA retaliation violation in Counts III and V of his Complaint.

[4]     Because the filing of plaintiff's Amended Complaint rendered moot defendant's initial motion to dismiss, all subsequent references to "Motion to Dismiss" in this Opinion will refer to the Motion of Defendant to Dismiss Counts III and VI of the Amended Complaint.

On November 18, 2011 defendant filed the within Motion to Dismiss Counts III and VI of the Amended Complaint.  Hence this Opinion.

### STANDARD OF REVIEW

A claim may be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."  Fed.R.Civ.P. 12(b)(6).  A Rule 12(b)(6) motion requires the court to examine the sufficiency of the complaint.  Conley v. Gibson, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957) (abrogated in other respects by Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Generally, in ruling on a motion to dismiss, the court relies on the complaint, attached exhibits, and matters of public record, including other judicial proceedings.  Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2008).

Except as provided in Federal Rule of Civil Procedure 9, a complaint is sufficient if it complies with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.R.Civ.P. 8(a)(2).  Rule 8(a)(2) "[does] not require heightened fact pleading of specifics, but only enough facts to

-4-

state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570, 127 S.Ct. at 1974, 167 L.Ed.2d at 949.[5]

In determining whether a plaintiff's complaint is sufficient, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief." <u>Fowler</u>, 578 F.3d at 210 (quoting <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008)).

Although "conclusory or bare-bones allegations" will not survive a motion to dismiss, <u>Fowler</u>, 578 F.3d at 210, a complaint may not be dismissed "merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." <u>Phillips</u>, 515 F.3d at 231. Nonetheless, to survive a 12(b)(6) motion, the complaint must provide "enough facts to raise a reasonable expectation that

---

[5]     The opinion of the United States Supreme Court in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 684, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868, 887 (2009), states clearly that the "facial plausibility" pleading standard set forth in <u>Twombly</u> applies to all civil suits in the federal courts. <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009).

     This showing of facial plausibility then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and that the plaintiff is entitled to relief. <u>Fowler</u>, 578 F.3d at 210 (quoting <u>Iqbal</u>, 556 U.S. at 678, 129 S.Ct. at 1949, 173 L.Ed.2d at 884).

     As the Supreme Court explained in <u>Iqbal</u>, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that the defendant acted unlawfully." <u>Iqbal</u>, 556 U.S. at 678, 129 S.Ct. at 1949, 173 L.Ed.2d at 884.

discovery will reveal evidence of the necessary element[s]."  Id.
(quoting Twombly, 550 U.S. at 556, 127 S.Ct. at 1965, 167 L.Ed.2d
at 940) (internal quotation omitted).

     The court is required to conduct a two-part analysis
when considering a Rule 12(b)(6) motion.  First, the factual
matters averred in the complaint, and any attached exhibits,
should be separated from legal conclusions asserted therein.
Fowler, 578 F.3d at 210.  Any facts pled must be taken as true,
and any legal conclusions asserted may be disregarded.  Id.
at 210-211.

     Second, the court must determine whether those factual
matters averred are sufficient to show that the plaintiff has a
"plausible claim for relief."  Id. at 211 (quoting Iqbal,
556 U.S. at 679, 129 S.Ct. at 1950, 178 L.Ed.2d at 884).

     Ultimately, this two-part analysis is "context-
specific" and requires the court to draw on "its judicial
experience and common sense" to determine if the facts pled in
the complaint have "nudged [plaintiff's] claims" over the line
from "[merely] conceivable [or possible] to plausible."
Iqbal,556 U.S. at 680, 129 S.Ct. at 1950-1951, 178 L.Ed.2d at
884-885 (internal quotations omitted).

     A well-pleaded complaint may not be dismissed simply
because "it strikes a savvy judge that actual proof of those
facts is improbable, and that a recovery is very remote and

unlikely."  <u>Twombly</u>, 550 U.S. at 556, 127 S.Ct. at 1965, 167 L.Ed.2d at 940-941.

FACTS

Based upon the averments in plaintiff's Amended Complaint, which I must accept as true under the applicable standard of review discussed above, the pertinent facts are as follows.

Plaintiff Robert Hodor is an adult individual who resides in Bethlehem, Northampton County, Pennsylvania. Defendant St. Luke's Hospital & Health Network ("St. Luke's") operates in Bethlehem, Pennsylvania.  Plaintiff worked for defendant for over 32 years, and from December 2006 to August 29, 2009, plaintiff was a Manager of defendant's Integrated Blood Conservation Program.[6]

In March 2006, plaintiff was diagnosed with clinical depression.  Plaintiff continues to suffer from the disorder, which causes substantial limitations in plaintiff's major life activities.[7]

On March 11, 2009, during a meeting with plaintiff's supervisor, Kathy Ransom ("Supervisor"), plaintiff lost his train of thought and had difficulty with word choice (the "Episode"). Immediately after the Episode, plaintiff underwent tests at

---

[6]      Amended Complaint at ¶¶ 2, 3, 9-10 and 12.

[7]      <u>Id.</u> at ¶¶ 13-15.

-7-

defendant's emergency room ("ER").  After staying in the hospital for two and a half days, plaintiff was released to return to work on Friday, March 13, 2009.  However, plaintiff's Supervisor would not permit him to return to work without clearance from a neurologist.  On April 1, 2009 plaintiff received such clearance.[8]

Nevertheless, plaintiff's Supervisor would not permit plaintiff to return to work in April, 2009 and insisted that plaintiff undergo additional neuropsychological testing. Accordingly, plaintiff underwent testing in April and May of 2009.  On June 18, 2009 the neuropsychologist who performed the testing on plaintiff sent, by facsimile ("fax") transmission, paperwork to plaintiff's Supervisor, indicating that plaintiff was able to return to work.[9]

Plaintiff returned to work on June 30, 2009.  Upon his return to work, plaintiff's Supervisor requested that defendant St. Luke's employees repeatedly question plaintiff about his work.  Accordingly, plaintiff was questioned repeatedly by two of defendant's employees with regard to what he was doing, and when, why, and how he was doing it.  Prior to the Episode,

---

[8]     Amended Complaint at ¶¶ 18-21, 23-24.

[9]     Id. at ¶¶ 25-27; Exhibit A at pages 8-9, Motion to Dismiss.

-8-

plaintiff had never been questioned about his work in such a manner.[10]

On July 6, 2009 plaintiff met with his Supervisor. During this meeting, plaintiff's Supervisor repeatedly informed him that she did not think he was "clinically competent to see patients."  Plaintiff agreed to go to defendant's ER for more testing.[11]

On July 6, 2009 plaintiff went to the ER at St. Luke's and subsequently was released to return to work.  However, even after the plaintiff's visit to the ER on July 6, 2009, plaintiff's Supervisor did not permit plaintiff to return to work.[12]

On July 13, 2009, plaintiff sent a letter to Andrew Seidel, defendant's Assistant Vice President of Human Resources.[13]  In this letter plaintiff complained about his Supervisor's conduct and her belief that plaintiff was not "clinically competent to see patients".  Plaintiff explained that he had been through multiple tests and that he had been cleared

---

[10]    Amended Complaint at ¶¶ 28 and 30-31.

[11]    Id. at ¶¶ 34-34.

[12]    Id. at ¶¶ 33-37.

[13]    See Exhibit B to Motion to Dismiss.

to return to work by several doctors.  Accordingly, plaintiff

requested that he be allowed to return to work.[14]

On July 15, 2009 and August 5, 2009 plaintiff met with

Mr. Seidel.  During these meetings plaintiff again complained

about his Supervisor's conduct.  Specifically, plaintiff alleged

that his Supervisor's conduct was illegal, harassing, and that he

was being treated improperly because of his medical condition and

because of his Supervisor's beliefs about his medical

condition.[15]

Plaintiff's Supervisor was made aware of plaintiff's

complaints and his requests to return to work.  However,

plaintiff was not permitted to return to work between July 6,

2009 and August 29, 2009.  On August 29, 2011 defendant fired

plaintiff.[16]  Defendant claimed that plaintiff had demonstrated

an "inability to safely perform the clinical aspects of his

job".[17]

However, defendant's purported reason for terminating

plaintiff was pretextual.  In reality, plaintiff was able to

perform his duties in a more than satisfactory manner, and he had

---

[14]    Amended Complaint at ¶ 38; Exhibit B, Motion to Dismiss.

[15]    Amended Complaint at ¶¶ 39-40.

[16]    The Amended Complaint does not specify who fired plaintiff on
behalf of defendant St. Luke's Hospital & Health Network.

[17]    Id. at ¶¶ 41-42 and 44-45.

consistently received positive performance evaluations during his time at St. Luke's.  The actual reason defendant fired plaintiff was because defendant incorrectly believed that plaintiff's clinical depression rendered him unfit for his job, and because plaintiff had complained to defendant's Human Resources Department about his Supervisor's behavior related to his depression.[18]

<u>DISCUSSION</u>

<u>Consideration of Extraneous Documents</u>

Defendant St. Luke's Hospital & Health Network attached two exhibits, Exhibits A and B, to its Motion to Dismiss Counts III and VI of [plaintiff's] Amended Complaint.

Exhibit A contains three documents.  The first document is a letter dated June 11, 2009 from plaintiff's Supervisor at St. Luke's, Critical Care Director, Kathy Ramson, to Thomas Sugalski, Ph.D. the licensed phsychologist who performed the neuropsychological examination on plaintiff ("June 11, 2009 letter").[19]

The second document is the Essential Functions: Manager Blood Management Program form dated June 18, 2009, which plaintiff's Supervisor attached to her June 11, 2009 letter to Dr. Sugalski.  Dr. Sugalski returned the completed Essential

---

[18]    Amended Complaint at ¶¶ 16-17 and 46-47.

[19]    Exhibit A at page 2, Motion to Dismiss.

Functions form to plaintiff's Supervisor by fax on June 18, 2009.[20]

The third document is the undated Confidential Neuropsychological Evaluation report prepared by Dr. Sugalski ("Report") following his examination of plaintiff on April 22, 2009, which outlines the psychologist's findings on his evaluation.[21]

Exhibit B is a letter dated July 13, 2009 from plaintiff to Andrew Seidel of defendant's Human Resources ("HR") department, which complains about his Supervisor not permitting him to return to work.[22]

Defendant contends that these documents show that plaintiff did not engage in a protected activity, as required in a retaliation claim under the ADA and the PHRA.  Specifically, defendant contends that plaintiff could not have had a good faith, reasonable belief that he was being discriminated against because of a disability because the documentation shows that plaintiff was not disabled.[23]

Plaintiff contends that Exhibits A and B cannot be considered because they are neither attached to, nor cited in,

---

[20]   Exhibit A at pages 8-9, Motion to Dismiss.

[21]   Id. at pages 3-7.

[22]   Exhibit B at page 2, Motion to Dismiss.

[23]   Defendant's Memorandum at pages 7-10.

plaintiff's Amended Complaint.  Additionally, plaintiff contends
that even if the documents are considered, he has sufficiently
alleged claims for retaliation under the ADA and PHRA.[24]

When deciding a motion to dismiss, a court generally
does not consider any document other than the pleadings.
In re Burlington Coat Factory Securities Litigation,
114 F.3d 1410, 1426 (3d Cir. 1997) (citing Angelastro v.
Prudential-Bache Securities, Inc., 764 F.2d 939, 944 (3d Cir.
1985)).

An exception to this general rule is when a defendant
attaches to the motion to dismiss an "undisputedly authentic
document", Pension Benefit Guaranty Corporation v. White
Consolidated Industries, Inc., 998 F.2d 1192, 1196 (3d Cir.
1993), that is "integral to or explicitly relied upon in the
complaint".  In re Burlington, 114 F.3d at 1426 (quoting Shaw v.
Digital Equipment Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)).  At
that point, the court may consider such a document without
turning a motion to dismiss into a motion for summary judgment.
Pension Benefit, 998 F.2d at 1196-97.

Here, plaintiff's allegations do not refer to, or
explicitly or implicitly rely on, the June 11, 2009 letter from
plaintiff's Supervisor to Dr. Sugalski.  While plaintiff does
rely on the fact that his Supervisor required him to have more

---

[24]     Plaintiff's Brief at pages 5-6 and 9.

tests completed before returning to work,[25] plaintiff does not rely on the June 11, 2009 letter, in particular, in making that claim.

Nor did plaintiff rely on Dr. Sugalski's Confidential Neuropsychological Evaluation Report.  Further, the contents of this Report are not integral to plaintiff's allegations in his Amended Complaint.  While the Report contains information regarding plaintiff's mental functioning and capacities at the time of the neuropsychological evaluation, and plaintiff claims that he has been diagnosed with clinical depression,[26] plaintiff does not rely on this Report in making that claim.

Moreover, this Report was not included in the same facsimile to plaintiff's Supervisor, which plaintiff refers to in the Amended Complaint, so it cannot be considered as part of the same document as the Essential Functions Form discussed above.[27] The fax referred to in the Amended Complaint was sent on June 18, 2009, and the Report was faxed on two different dates: May 14, 2009 and June 16, 2009.[28]

However, plaintiff explicitly relies on the "Essential Functions Form" that Dr. Sugalski filled out and faxed to

---

[25]     See e.g., Amended Complaint at ¶ 25.

[26]     Amended Complaint at ¶ 13.

[27]     Id. at ¶ 27.

[28]     Exhibit A, Motion to Dismiss.

-14-

plaintiff's Supervisor on June 18, 2009.  Specifically, in paragraph 27 of the Amended Complaint, plaintiff relies on that form to support the claim that he was clinically competent to perform his job duties.

Additionally, plaintiff explicitly relies on the July 13, 2009 letter from plaintiff to Mr. Seidel of defendant's HR Department.  Specifically, plaintiff refers to the letter at paragraph 38 of the Amended Complaint to support his allegation that he made a complaint about his Supervisor's behavior.

Accordingly, I consider the Essential Functions form and the July 13, 2009 letter in adjudicating the within Motion to Dismiss.  However, I do not consider the June 11, 2009 letter or Dr. Sugalski's Confidential Neuropsychological Evaluation Report.

<u>Counts III and VI: Retaliation</u>

Defendant seeks dismissal of Counts III and VI of Plaintiff's Amended Complaint.  Count III is a claim for retaliation in violation of the Americans with Disabilities Act ("ADA").[29]  Count VI is a claim for retaliation in violation of the Pennsylvania Human Relations Act ("PHRA").[30]  Retaliation claims under the ADA and the PHRA are analyzed in the same manner.  <u>Rinehimer v. Cemcolift</u>, 292 F.3d 375, 382 (3d Cir. 2002).

---

[29]     Amended Complaint at ¶¶ 64-67.

[30]     <u>Id.</u> at ¶¶ 76-78.

-15-

To state a claim for retaliation under the ADA, a plaintiff must show that (1) plaintiff engaged in an ADA-protected activity; (2) defendant took an adverse employment action against plaintiff either at the same time or after plaintiff's protected activity; and (3) a causal relationship exists between plaintiff's protected activity and defendant's adverse employment action.  Aman v. Cort Furniture Rental Corporation, 85 F.3d 1074, 1085 (3d Cir. 1996).

### ADA-Protected Activity

The ADA states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act."  42 U.S.C. § 12203(a).  Accordingly, a plaintiff who complains to his employer that the ADA has been violated is protected from retaliation under the Act.  See Gharzouzi v. Northwestern Human Services Of Pennsylvania, 225 F.Supp.2d 514, 540 (E.D.Pa. May 7, 2002) (Antwerpen, J.) (citing Barber v. CSX Distribution Services, 68 F.3d 694, 701-02 (3d Cir. 1995))).

The activity a plaintiff complains about need not actually be in violation of the ADA.  However, in order for a complaint to constitute protected activity under the ADA, a plaintiff must have a good faith, reasonable belief that an ADA-violation occurred.  Aman, 85 F.3d at 1085.

In determining whether a specific complaint constitutes protected activity, courts consider the content of the complaint, rather than its form.  Barber, 68 F.3d at 702.  Accordingly, a complaint need not be written or formal.  Id.  However, general claims of unfair treatment are not protected under this provision of the ADA.  Id. at 701-02.

Here, plaintiff has alleged sufficient facts to establish that he engaged in ADA-protected conduct.

Plaintiff alleges that on July 13, 2009, he sent a letter to Mr. Seidel of defendant's Human Resources department, in which he complained about his Supervisor's conduct. Additionally, plaintiff alleges that on July 15, 2009 and August 5, 2009 plaintiff met with Mr. Seidel.  During these meetings plaintiff alleged that his Supervisor's conduct was illegal and harassing, and that he was being treated improperly because of his medical condition and because of his Supervisor's beliefs about his medical condition.[31]

Plaintiff's July 13, 2009 letter does not explicitly complain about discrimination because of his clinical depression, and thus, does not by itself constitute ADA-protected behavior. However, plaintiff alleges that he complained that his Supervisor's conduct was in violation of the ADA during the July 15, 2009 and August 5, 2009 meetings with Mr. Seidel.

---

[31]    Amended Complaint at ¶¶ 39-40.

-17-

A complaint need not be written or formal to be protected under the ADA.  Barber, 68 F.3d at 702.  Therefore, plaintiff has sufficiently alleged that he engaged in protected activity.   Plaintiff's complaints to Mr. Seidel that he was being treated improperly because of his medical condition is specific enough to constitute ADA-protected activity.

Moreover, plaintiff has alleged sufficient facts to infer that he had a reasonable, good faith belief that an ADA-violation had occurred.

The ADA forbids discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112.

Plaintiff was reasonable in believing that he was qualified for his position at St. Luke's Hospital & Health Network.[32]  Specifically, plaintiff had worked at St. Luke's for over 32 years.[33]  His work performance was "more than satisfactory", and he had "consistently received positive performance evaluations".[34]  Additionally, as of June 22, 2009,

---

[32]     A "qualified individual" under the ADA is someone who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

[33]     Amended Complaint at ¶ 9.

[34]     Id. at ¶¶ 16-17.

plaintiff was "able to return to full capacity required for [his] position".[35]

Plaintiff was also reasonable in believing that he that he has a disability, as defined by the ADA.  Specifically, plaintiff alleges that he suffers from clinical depression, which substantially limits major life activities.[36]

Moreover, plaintiff was reasonable in believing that defendant discriminated against plaintiff based on his disability.  Specifically, plaintiff alleges that his Supervisor refused to permit him to return to work despite being cleared by multiple doctors.  Additionally, plaintiff's Supervisor directed defendant's employees to repeatedly question him about his work.  However, prior to the Episode, he had never been questioned in such a manner.[37]

Therefore, the allegations in the Amended Complaint are sufficient to establish that plaintiff engaged in protected activity under the ADA.

<u>Adverse Action</u>

In order to state a retaliation claim under the ADA, a plaintiff must allege that he suffered from an adverse action.

---

[35]    Exhibit A at page 8, Motion to Dismiss.

[36]    The ADA defines a disability as including "a physical or mental impairment that substantially limits one or more major life activities of such individual".  42 U.S.C. § 12102(1).

[37]    Amended Complaint at ¶¶ 20, 23-25, 27, 30-32 and 36-37.

Termination from employment after engaging in ADA-protected behavior is sufficient to satisfy the adverse employment action element for an ADA retaliation claim.  See Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183 (3d Cir. 2003).

Here, plaintiff alleges that following the meetings with Mr. Seidel, in which plaintiff engaged in ADA-protected activity, defendant fired him.[38]  Thus, the adverse employment element for plaintiff's ADA retaliation claim is satisfied.

### Causal Relationship

To state a claim for retaliation, plaintiff must also show that a causal relationship exists between plaintiff's ADA-protected behavior and defendant's adverse action against plaintiff.

To establish causation a plaintiff may show either (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory activity; (2) a pattern of antagonism coupled with timing; or (3) an inference of causation from the "evidence gleaned from the record as a whole". Griesbaum v. Aventis Pharmaceuticals, 259 Fed.Appx. 459, 466-467 (3d Cir. 2007) (citing Lauren W. ex rel Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (quoting Farrell v. Planters Lifesavers Company, 206 F.3d 271, 281 (3d Cir. 2000))).

---

[38]     Amended Complaint at ¶ 44.

-20-

The element of causation involves an inquiry into the motives of an employer and therefore is context-specific. Kachmar v. SunGuard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir. 1997).   Accordingly, the absence of immediacy between the cause and effect does not disprove causation.   Id.

For example, the United States Court of Appeals for the Third Circuit has held that a period of less than three months is sufficient to suggest a "temporal proximity", and found that the plaintiff had established causation when that proximity is considered together with the fact that plaintiff's employer had questioned plaintiff about his pending age discrimination claim. Fasold v. Justice, 409 F.3d 178, 189-90 (3d Cir. 2005).

Here, defendant contends that the amount of time between plaintiff's complaint to HR and plaintiff's termination precludes finding a causal connection between plaintiff's protected activity and his termination.[39]

However, drawing all reasonable inferences in favor of plaintiff, as I am required to do by the applicable standard of review, the timing of plaintiff's termination in conjunction with plaintiff's other allegations suggests that plaintiff was terminated because he engaged in protected activity.

Here, plaintiff was terminated three and a half weeks after plaintiff complained to Mr. Seidel at the August 5, 2009

---

[39]     Defendant's Memorandum at page 10.

meeting.[40]  Drawing all reasonable inferences in favor of plaintiff, the temporal proximity of plaintiff's protected activity and termination, coupled with plaintiff's other allegations, are adequate to infer causation.

Plaintiff worked for defendant for over 32 years and he consistently received positive performance evaluations concerning his work performance.  However, after the Episode, plaintiff's Supervisor directed St. Luke's employees to repeatedly question plaintiff about his work, when he had never been questioned in such a manner before the Episode.[41]  Moreover, even after multiple doctors authorized plaintiff to return to work, his Supervisor continually refused to let him return, claiming that he was not fit to perform his job duties.[42]

At some point after plaintiff's Supervisor found out about plaintiff's complaints,[43] defendant terminated plaintiff's employment.

The above facts, "gleaned from the record as a whole", are sufficient for a trier of fact to plausibly infer causation

---

[40]   The allegations in the Amended Complaint do not make it clear whether plaintiff discussed his medical condition with Mr. Seidel during his meeting on July 15, 2009 or on August 5, 2009.

[41]   Amended Complaint at ¶¶ 30-32.

[42]   Id. at ¶¶ 20, 23, 24-25, 27, 36-37; Exhibit A at pages 8-9, Motion to Dismiss.

[43]   The Amended Complaint does not indicate precisely when plaintiff's Supervisor became aware that plaintiff had made complaints to HR.

between plaintiff's complaint to Mr. Seidel and plaintiff's termination thereafter.  <u>Griesbaum</u>, 259 Fed.Appx. at 467.

Accordingly, plaintiff has sufficiently alleged a retaliation claim under the ADA and PHRA.  Therefore, defendant's motion to dismiss is denied.

<u>CONCLUSION</u>

For all of the foregoing reasons, defendant's Motion to Dismiss Counts III and VI of the Amended Complaint is denied. Defendant shall have until October 29, 2012 to file an Answer to plaintiff's Amended Complaint.